

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| HELSON PACHECO-SERRANT, M.D., | § | |
| | | No. 08-15-00357-CV |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | County Court at Law No. 3 |
| CARMEN MUNOZ, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 2015-DCV-0138) |
| | § | |

**O P I N I O N**

This appeal involves the sufficiency of a threshold expert report in a medical malpractice case. Plaintiff Carmen Munoz filed a healthcare liability claim against Dr. Pacheco-Serrant, ("Pacheco") claiming that he was responsible for injuries allegedly caused by his negligent performance of a back surgery in January of 2013. Dr. Pacheco moved to dismiss the lawsuit, contending that Munoz's expert report failed to meet the requirements of the Texas Medical Liability Act (TMLA). The trial court sustained Dr. Pacheco's objections to the expert report and gave Munoz thirty days to file and serve a curative expert report on Dr. Pacheco. Munoz timely filed a "supplemental" expert report, and Dr. Pacheco filed objections to that report, as well as a motion to dismiss, contending that the supplemental report was also deficient. The trial court denied the motion, and Dr. Pacheco filed this interlocutory appeal. We affirm.

## BACKGROUND

### Original Petition

On January 15, 2015, Carmen Munoz alleged in her original petition that:

#### Facts

On January 16, 2013, Defendant Helson Pacheco-Serrant M.D. performed L4-L5 decompression, posterolateral fusion, Aspen instrumentation, revision of fusion instrumentation L5-S1, and decompression L5-S1, according to the operative report. As a result of the surgery, Plaintiff developed complications, including urinary problems.

#### Liability of Defendants

Plaintiff alleges that Defendant Helson Pacheco-Serrant M.D. negligently performed the surgery which was a proximate cause of Plaintiff's injuries and damages including urinary problems, pain and suffering, mental anguish, and medical expenses, in the past and in reasonable probability into the future.

### The First Expert Report

As required by the TMLA, on May 20, 2015, Munoz timely filed and served an expert report authored by J. Martin Barrash, M.D., a physician board-certified in neurological surgery with over 45 years of experience in the field of neurosurgery. The pertinent section is as follows:

Helson Pacheco-Serrant, M.D.'s 4/30/2012 history and physical record shows Carmen Munoz, 50 years old, complained of back pain, radiating down to the left lower extremity to the ankle region for approximately one year. Conservative management was unsuccessful. Her pain was constant and exacerbated by prolonged sitting, lying, walking and bending. There is no evidence of bowel or bladder problems. His diagnosis was low back pain, lumbar disc herniation with radiation to the left lower extremity. On 4/30/2012, Helson Pacheco-Serrant, M.D. performed a L5-S1 posterior lateral fusion with Aspen instrumentation. The ODG criteria were not met by Dr. Pacheco-Serrant for a fusion and therefore did not meet the standard of care.

On 8/23/2012, the patient returned to Dr. Pacheco-Serrant complaining of bilateral lower extremity numbness. Dr. Pacheco-

2

Serrant ordered an MRI and requested that the patient return in two weeks.

On 09/06/2012, the patient returned to see Dr. Pacheco-Serrant. The patient complained of heaviness in her lower extremities. There were no complaints of back pain nor weakness. The MRI of the lumbar spine showed no stenosis, no adjacent disc disease nor nerve impingement.

On 01/16/2013, Dr. Pacheco-Serrant performed the following procedures: L4-L5 decompression, posterolateral fusion, Aspen instrumentation, revision of fusion instrumentation L5-S1, and decompression L5-S1. There was no indication for the surgery at L4-L5 or a reoperation at L5-S1. The standard of care again was not met.

Post surgically the patient began experiencing loss of bladder control. Were the unindicated surgeries not performed, the loss of bladder control would not have occurred. It is my opinion that the patient's urinary bladder dysfunction following the 1/16/2013 spine surgery was caused by the surgery and damage during the L5-S1 fusion and L4-L5 surgery and fusion. The standard of care of [sic] requires protection of the nerves during the fusion, since injury to nerve affects urinary evacuation. This breach of the standard of care was the proximate cause of the urinary problem. My opinions

are based on reasonable medical probability. I reserve the right to amend and supplement my opinions. [1] [2] [3] [4]

**Dr. Pacheco's Objections to the First Expert Report and Motion to Dismiss**

Dr. Pacheco filed timely objections contending that Dr. Barrash's report was conclusory as to the standard of care, breach, and causation, and was therefore inadequate to meet the requirements of the TMLA. Dr. Pacheco's objections addressed Dr. Barrash's opinion regarding whether the January 2013 surgery was negligently performed, as pleaded in Munoz's petition; his objections did not address Dr. Barrash's opinion the January 2013 surgery was not medically indicated.

Dr. Pacheco objected the expert report failed to identify the standard of care that Dr. Pacheco violated; Dr. Pacheco complained Dr. Barrash failed to identify the nerve or nerves that

---

[1] According to medical literature, spinal fusion is surgery to permanently join together two or more bones in the spine so there is no movement between them. https://medlineplus.gov/ency/article/002968.htm. The L5-S1 refers to the lumbosacral joint in the spine; the L5 vertebrae is the lowest of the lumbar spine's five vertebrae; and the L5-S1 disc lies between the L5 and S1 vertebrae. If the inner portion of that disc herniates or degenerates, it can cause leg pain and/or lower back pain. https://www.spine-health.com/conditions/spine-anatomy/all-about-l5-s1-lumbosacral-joint. Aspen instrumentation refers to a line of devices which can be used during certain less invasive spinal fusion surgery, in place of screws, for "fixation" of the spine. In particular, the medical literature indicates that when used during L5-SI surgeries, it allows for an "improved anatomic fit at L5-S1 by conforming to the sacral anatomy." http://www.medgadget.com/2011/09/lanx-adds-new-device-to-their-aspen-line-for-l5-s1-fusion.html.

[2] According to medical literature,"[d]ecompression is a surgical procedure that is performed to alleviate pain caused by pinched nerves…. During a lumbar decompression back surgery, a small portion of the bone over the nerve root and/or disc material from under the nerve root is removed to give the nerve root more space and provide a better healing environment." https://www.spine-health.com/treatment/back-surgery/lumbar-decompression-back-surgery.

[3] ODG stands for "official disability guidelines," which appear to be guidelines used primarily in workers' compensation cases; the ODG criteria include "comprehensive and up-to-date medical treatment and return to work guideline[s] worldwide, providing evidence-based decision support to improve as well as benchmark outcomes in workers' comp, non-occupational disability and general health insurance [cases]." The ODG criteria are utilized by various entities, including health insurance companies and governmental agencies, to assist in resolving claims. http://www.worklossdata.com.

[4] According to medical literature, "stenosis means the abnormal narrowing of a body channel. When combined with the word spinal, it defines a narrowing of the bone channel occupied by the spinal nerves or the spinal cord." https://www.spine-health.com/conditions/spinal-stenosis/what-spinal-stenosis.

4

Dr. Pacheco was required to protect during the surgery, and further failed to describe what steps Dr. Pacheco should have taken to protect those nerves. Further, Dr. Pacheco argued the report did not adequately address the issue of causation, contending Dr. Barrash did not adequately identify or explain which nerves were damaged during the surgery, how they were damaged, and/or how the damage caused Munoz's alleged loss of bladder control.

Munoz did not file a response to the objections and/or the motion to dismiss, and by written order dated September 21, 2015, the trial court sustained Dr. Pacheco's objections, giving Munoz 30 days to file and serve a curative report on Dr. Pacheco, as permitted by the TMLA.

## The Supplemental Curative Report

On October 21, 2015, Munoz timely filed and served a supplemental report which was authored by Dr. Barrash. The pertinent sections of the supplemental report are:

> As previously explained, the standard of care requires that the 1/16/2013 surgical procedures on L4-L5 and L5-S1 be recommended and performed only when medically indicated for Carmen Munoz. It would have been medically indicated only if this was a re-do laminectomy, or if there was severe degenerative disc disease or spinal instability. Since these conditions were not present, the procedures were not medically indicated. In other words, the evidence-based data shows that for Mrs. Munoz, the procedure would not be effective in treating her condition. Therefore, the recommendation and performance of the procedures were a breach of the standard of care.
>
> The spinal nerves that provide bladder control are located in the 1/16/2013 surgical site. At the sacral level the "cord" has actually become the cauda equina. Partial or full damage to the nerves that control the bladder (S1-4) can result in incomplete emptying of the bladder. In this case, the instrumentation of the procedure more likely than not damaged the nerves that control the bladder. Thus, the unindicated surgery and breach of the standard of care were a substantial cause of Mrs. Munoz' loss of bladder control. Had the procedure not been performed, Mrs. Munoz would not have developed loss of bladder control. My opinions are based on

5

reasonable medical probability. I reserve the right to supplement and amend my opinions.[5]

The second page of the expert report is a letter from Dr. Barrash in which he attached the ODG criteria stating:

> The ODG criteria for doing a fusion will be enclosed but basically it is re-do lumbar laminectomy, [for] severe degenerative disease and spinal instability. Fortunately, Carmen Munoz had none of those problems and therefore, Dr. Helson Pacheco-Serrant did not follow the ODG criteria and deviated from therefore from the standard of care.
>
> The fusions that were done were unnecessary procedures performed by Dr. Pacheco-Serrant. The patient was left with devastating residual loss of bladder.

The ODG criteria included by Dr. Barrash states the following:

> **ODG for the Low Back Regarding:   Spinal Fusion**
>
> Not recommended for patients who have less than six months of failed recommended conservative care unless there is objectively demonstrated severe structural instability and/or acute or progressive neurologic dysfunction, but recommended as an option for spinal fracture, dislocation, spondylolisthesis or frank neurogenic compromise, subject to the selection criteria outlined in the section below entitled, "Patient Selection Criteria for Lumbar Spinal Fusion," after 6 months of conservative care.
>
> **Patient Selection Criteria for Lumbar Spinal Fusion:**
>
> For chronic low back problems, fusion should not be considered within the first 6 months of symptoms, except for fracture, dislocation or progressive neurologic loss. Indications for spinal fusion may include:

---

[5] A laminectomy is "a procedure involving surgical removal of the bony arch of the vertebrae (lamina) which covers the nerve and allows for exploration of the disc and foramina, often used in the treatment of spinal stenosis." "A lumbar laminectomy is also known as an open decompression and typically performed to alleviate pain caused by neural impingement that can result from lumbar spinal stenosis." https://www.spine-health.com/glossary/laminectomy.

(1) Neural Arch Defect – Spondylolytic spondylolisthesis, congenital neural arch hypoplasia.

(2) Segmental Instability (objectively demonstrable) – Excessive motion, as in degenerative spondylolisthesis, surgically induced segmental instability and mechanical intervertebral collapse of the motion segment and advanced degenerative changes after surgical discectomy.

.   .   .

(3) Primary Mechanical Back Pain (i.e., pain aggravated by physical activity)/Functional Spinal Unit Failure/Instability, including one or two level segmental failure with progressive degenerative changes, loss of height, disc loading capability.

.   .   .

(4) Revision Surgery for failed previous operation(s) if significant functional gains are anticipated. Revision surgery for purposes of pain relief must be approached with extreme caution due to the less than 50% success rate reported in medical literature.

(5) Infection, Tumor or Deformity of the lumbosacral spine that cause intractable pain, neurological deficit and/or functional disability.

(6) After failure of two discectomies on the same disc, fusion may be an option at the time of the third discectomy, which should also meet the ODG criteria.

### Dr. Pacheco's Objections to the Supplemental Expert Report and Second Motion to Dismiss

Dr. Pacheco filed a motion to dismiss based on his objections to Dr. Barrash's supplemental report on October 30, 2015. First, he complained that Dr. Barrash's supplemental report only "partially address[ed]" his objections to the first report, by describing the location of the nerves that control the bladder, and by asserting they were located at the surgical site area. Dr. Pacheco pointed out that the supplemental report did not address his objection Dr. Barrash had failed to

7

adequately describe the standard of care. On the issue of causation, Dr. Pacheco further complained that Dr. Barrash did not address how the nerves were damaged, contending that Dr. Barrash's statement that "instrumentation of the procedure more likely than not damaged the nerves that control the bladder" was too "vague and conclusory" to address the issue. Moreover, Dr. Pacheco pointed out that although Dr. Barrash's report indicated that nerve damage during surgery can result in "incomplete emptying" of the bladder, he described Munoz's injury as a "loss of bladder function," with no explanation of how those two conditions were related.

Second, Dr. Pacheco objected to Dr. Barrash's opinion that the January 2013 surgery was not medically indicated, pointing out that Munoz never made this allegation in her petition, and that the only theory of liability set forth in her petition was that he had "negligently performed" the January 2013 surgery. Dr. Pacheco argued that the sufficiency of an expert report must be evaluated based solely on whether the report supports a theory of liability alleged in the plaintiff's pleadings, and that this portion of the report therefore could not be utilized to meet the requirements of the TMLA.

**Munoz's Amended Petition**

Munoz filed a First Amended Original Petition on November 24, 2015. In her amended petition, Munoz alleged that Dr. Pacheco had "negligently performed" the January 2013 surgery, and added his "negligence includes performing surgery which is not medically indicated."

**The Hearing on Dr. Pacheco's Objections and Motion to Dismiss**

The reporter's record of the hearing on Dr. Pacheco's motion to dismiss indicates that it started promptly at 10:30:22 a.m. on November 24, 2015. The parties engaged in an extensive argument regarding whether the trial court could properly consider Dr. Barrash's opinion that the

8

surgery was not medically indicated because Munoz had failed to make that allegation in her original petition. Munoz's attorney informed the trial court he had filed an amended petition adding that allegation shortly before the hearing started, acknowledging Dr. Pacheco's counsel had not likely received a copy of the amended petition, explaining he had "filed it before she got here."

At that point in the hearing, the focus shifted to the question of whether the trial court should permit Munoz to file an amended petition so late in the game—after Dr. Pacheco had already filed his objections and his motion to dismiss, and after the hearing had already started on his motion. Dr. Pacheco's attorney objected to the filing of the amended petition, asserting that it raised a completely new and separate cause of action, and that it would be unfair to allow Munoz to bring the new claim at that late date. Munoz's attorney, on the other hand, argued that it was not a new claim. Munoz asserted her claim in the original petition, that Dr. Barrash "negligently performed" the surgery, was broad enough to include the claim that: (1) he was negligent in the way in which he performed the surgery; and (2) that he was negligent in performing a surgery that was not medically indicated. Munoz's counsel explained that although he believed the original petition was sufficient to cover both claims, he made the decision to file the amended petition out of an "abundance of caution" after he received Dr. Pacheco's objections asserting that the second claim had not been adequately pleaded.

**The Trial Court's Ruling**

At the close of the hearing, the trial court took the matter under advisement, and later that same day, issued a written order denying the motion to dismiss. In its order, the trial court expressly found Dr. Barrash's curative report met the requirements of the TMLA, and his report

9

adequately covered "the negligence cause of action in the Original Petition and the Amended Petition." The trial court further noted Dr. Pacheco had "objected" to the amendment, but had failed to present any evidence to support the objection as required by Rule 63 of the Texas Rule of Civil Procedure. And finally, the trial court expressly concluded the amendment did not "present a new cause of action." This appeal followed.

## DISCUSSION

Dr. Pacheco contends the trial court abused its discretion in denying the motion to dismiss because: (1) Dr. Barrash's curative expert report did not address the objections that he had previously made to Dr. Barrash's initial report, which the trial court had sustained; (2) the curative report did not meet the requirements of the TMLA; and (3) the curative report at most addressed an "unpleaded and factually ungrounded theory of liability," which should not have been considered by the trial court.

### Standard of Review

We review a trial court's decision to dismiss a case on inadequate expert report grounds for abuse of discretion. *Tenet Hosps., Ltd. v. Barajas,* 451 S.W.3d 535, 539 (Tex. App.--El Paso 2014, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). As a reviewing court on matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court merely because we would have ruled differently. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). When reviewing decisions that fall within the trial court's

discretion, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam).

## Applicable Law and Standard of Care

The TMLA "aims to 'identify and eliminate frivolous healthcare[-] liability claims expeditiously, while preserving those of potential merit.'" *See Hebner v. Reddy,* 498 S.W.3d. 37, 40 (Tex. 2016). The statute sets a strict deadline for a claimant to file and serve expert reports to substantiate a health care claim. *Id.* (citing *Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex. 2011) (internal citations omitted)). Under the current version of the TMLA, the plaintiff in a health care liability case must serve an expert report on the defendant no later than 120 days after the defendant has filed his original answer to the plaintiff's petition, together with the expert's curriculum vitae, establishing the expert's qualifications. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017). Thereafter, the defendant must file any objections to the expert report not later than the 21st day after the report is served. *Id.* The trial court may grant a single 30-day extension of time to allow the plaintiff to file a curative report if her first report is found to be inadequate; if an adequate report is not filed and served within the applicable time periods, the court shall enter an order that: "(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

The TMLA defines "expert report" to mean one that "provides a fair summary of the expert's opinions" regarding (1) the standard of care, (2) how the health care provider failed to meet that standard, and (3) the causal relationship between that failure and the injury, harm, or

11

damages claimed. *See THN Physicians Ass'n v. Tiscareno,* 495 S.W.3d 599, 606 (Tex. App.--El Paso 2016, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2016); *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex. 2011)). A "fair summary of the expert's opinions" means that, at the least, the report must state more than mere conclusions and must instead explain the basis of the expert's opinion to link the conclusions to the facts of the case. *Id.* (citing *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 304 (Tex. App.--El Paso 2015, no pet.); *see also Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002)). While the claimant need not marshal all her evidence to support the expert's opinion at this stage of the proceedings, there must be sufficient facts within the report to meet the objectives of the statute. *Garcia*, 462 S.W.3d at 304. In addition, the TMLA does not require a plaintiff to file an expert report with respect to each liability theory alleged against the defendant. *See Tenet Hosps. Ltd. v. Bernal,* 482 S.W.3d 165, 171 (Tex. App.--El Paso 2015, no pet.). Instead, an expert report that adequately addresses at least one pleaded theory of liability satisfies the statutory requirements. *Certified EMS, Inc. v. Potts,* 392 S.W.3d 625, 632 (Tex. 2013); *see also TTHR Ltd. P'ship v. Moreno,* 401 S.W.3d 41, 44–45 (Tex. 2013).

Once an expert report is timely served and properly challenged, the trial court must grant a motion challenging the adequacy of an expert report if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. *Tiscareno*, 495 S.W.3d at 606 (citing *Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex. 2012); *Garcia*, 462 S.W.3d at 304); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). To qualify as an objective good faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff questions, and (2) provide a basis for the trial court to conclude that the

plaintiff's claims have merit. *See Scoresby,* 346 S.W.3d at 556 (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)); *see also Potts,* 392 S.W.3d at 630–31.

In determining whether the report meets the statute's requirements, the court may look no further than the report itself, because all the information relevant to the inquiry must be contained within the document's four corners. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *see also Baker v. Gomez*, 276 S.W.3d 1, 8 (Tex. App.--El Paso 2008, pet. denied). The court should not have to fill in missing gaps in a report by drawing inferences or resorting to guess work. *Garcia*, 462 S.W.3d at 304; *see also Kanlic v. Meyer,* 320 S.W.3d 419, 422 (Tex. App.--El Paso 2010, pet. denied). Where a timely-filed expert report is deficient, the trial court may grant one 30-day extension to cure the deficiencies, unless it is objectively shown that the report was not filed in good faith, at which point, dismissal is required. *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.--El Paso 2016, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c)).

The sufficiency of the expert report's causation statement should be viewed in the context of the entire report. *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.--Dallas 2010, no pet.). The detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim. *Mendez–Martinez v. Carmona*, 510 S.W.3d 600, 609 (Tex. App.--El Paso 2016, no pet.) ("While plaintiffs need not drill down into every possible detail in every case in order to survive dismissal, a report in a case alleging negligence in the context of a complex surgery involving multiple doctors and nurses, for example, will necessarily require more details than a report dealing with more straightforward negligence allegations.").

**Analysis**

13

On appeal, Munoz focuses on the two theories of liability set forth in her amended petition: (1) whether the January 2013 surgery was negligently performed; and (2) whether the January 2013 surgery was not medically indicated. If we find that one theory was properly pleaded and supported by Dr. Barrash's expert reports, our inquiry will necessarily stop, and we will affirm the trial court's decision. However, as the TMLA only permits a trial court to grant one 30-day extension of time allowing a plaintiff to file a curative report after a defendant doctor files objection to the plaintiff's first report, if we find that neither of the two theories were properly pleaded and/or supported by Dr. Barrash's curative report, we will be required to reverse the trial court's decision, and dismiss with prejudice Munoz's claims, with no opportunity for Munoz to file a third report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency."); *see also Marino v. Wilkins,* 393 S.W.3d 318, 332 (Tex. App.--Houston [1st Dist.] 2012, pet. denied) (recognizing that a plaintiff's claim must be dismissed with prejudice if deficiencies in expert report are not cured after a 30-day extension is granted, as the trial court is only empowered to grant a single extension of time to cure an objected-to deficiency); *Barber v. Mercer*, 303 S.W.3d 786, 793 n.3 (Tex. App.--Fort Worth 2009, no pet.) (recognizing that plaintiff has only one opportunity to amend a deficient expert report).

### Expert Report's Alleged Failure to Address Pleadings

As set forth above, Munoz's original petition alleged Dr. Pacheco "negligently performed" the January 16, 2013 surgery resulting in Munoz's "injuries." After Dr. Pacheco argued in his objections to Dr. Barrash's curative report that Munoz's original petition did not expressly allege

14

that the January 2013 surgery was not medically indicated, Munoz filed an amended petition, which alleged Dr. Pacheco's negligence "include[d]" his performance of a surgery that was "not medically indicated."   At the hearing on this matter, Dr. Pacheco argued that this raised a new and entirely different cause of action, while Munoz argued that her initial allegation that Dr. Pacheco "negligently performed" the January 2013 surgery, as set forth in her original petition, was broad enough to include this claim as well, and therefore did not raise a new cause of action or theory of liability.   In its written order, the trial court agreed with Munoz, and expressly found that Munoz's amended petition did not raise a "new cause of action."

Dr. Pacheco contends that the trial court erred in reaching this conclusion, arguing that these two theories of liability, i.e., the negligent performance of a surgery and the performance of an unnecessary surgery, constituted two entirely separate and distinct causes of action that were required to be pleaded separately.   Munoz, on the other hand, argues that it was "reasonable for the trial court to conclude that negligently performed surgery includes unnecessary or unindicated surgery."

In considering this issue, we recognize that there are a line of cases holding that a plaintiff's claim that a defendant doctor performed an unnecessary surgery falls within the general category of a negligence claim, as opposed to a claim based on the lack of informed consent.   *See generally Binur v. Jacobo,* 135 S.W.3d 646, 655-56 (Tex. 2004) (if a patient's claim is that the physician performed an incorrect or unnecessary surgery, that claim is one for negligence, not informed consent); *Neeble v. Sepulveda,* 989 S.W.2d 390, 390 (Tex. App.--Houston [1st Dist.] 1999, no pet.) (a complaint that a physician performed unnecessary surgery can form the basis for a cause of action based on negligence, as such a claim falls within the realm of negligence, and not informed

15

consent issues); *Patton v. Saint Joseph's Hosp.,* 887 S.W.2d 233, 247 (Tex. App.--Fort Worth 1994, writ denied) (while misdiagnosis and mistreatment might constitute negligence, it does not constitute lack of informed consent) (citing *Marling v. Maillard,* 826 S.W.2d 735, 738 (Tex. App.--Houston [14th Dist.] 1992, no writ)).

We also note that if a plaintiff alleges more than one claim, which all fall within the same cause of action, i.e. negligence, the expert report need only address the pleaded liability theory. *See Potts,* 355 S.W.3d at 691–92 (noting that the expert report is required to address each "cause of action," which refers not to a specific claim, but rather a "group of operative facts giving rise to one or more bases for suing"). An expert is not required to address each act or omission mentioned in the pleadings, so long as at least one liability theory within each cause of action is sufficiently addressed. *Lopez v. Brown,* 356 S.W.3d 599, 604–05 (Tex. App.--Houston [14th Dist.] 2011, no pet.); *Potts,* 355 S.W.3d at 691–94, 700.

While the TMLA does not contain any provisions addressing pleading requirements, we note that the Act does provide that the Texas Rules of Civil Procedure, and other procedural rules, shall apply to health care liability claims, unless a conflict exists between those rules and the provisions of the Act. TEX. CIV. PRAC. & REM. CODE ANN. § 74.002(a) (West 2017) ("In the event of a conflict between this chapter and another law, including a rule of procedure or evidence or court rule, this chapter controls to the extent of the conflict."). As such, we base our analysis on the general rules applicable to other civil cases in Texas.

Texas follows a "fair notice" standard for pleadings in civil cases, in which courts assess the sufficiency of pleadings by determining whether an opposing party can ascertain from the pleading the nature, basic issues, and the type of evidence that might be relevant to the controversy.

16

*See Low v. Henry,* 221 S.W.3d 609, 612 (Tex. 2007). The procedural rules and the case law interpreting them require that pleadings must provide a short statement of the cause of action sufficient to give the opposing party fair notice of the claim involved. *City of Socorro v. Campos*, 510 S.W.3d 121, 129 (Tex. App.--El Paso 2016, pet. denied) (citing *Paramount Pipe & Supply Co., Inc. v. Muhr*, 749 S.W.2d 491, 494 (Tex. 1988); TEX. R. CIV. P. 45; TEX. R. CIV. P. 47).[6] The rules do not require a plaintiff to set out in the pleadings all the evidence upon which the plaintiff relies to establish an asserted cause of action. *Id.*

Further, although the TMLA does not define the term "cause of action," the generally accepted meaning of that phrase in civil cases refers to the "'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief (emphasis added).'" *Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex. 2012) (citing *In re Jorden,* 249 S.W.3d 416, 421 (Tex. 2008) (quoting *A.H. Belo Corp. v. Blanton,* 133 Tex. 391, 129 S.W.2d 619, 621 (1939)). In addition, the term, "cause of action," has also been defined as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *In re Jorden,* 249 S.W.3d at 421 (quoting Black's Law Dictionary 235 (8th ed. 2004)).

Munoz, asserts that if Dr. Pacheco had any doubt about the nature of her pleadings, he was required to file "special exceptions" to her pleadings, which he failed to do; Munoz then asserts that in the absence of any such "special exceptions," her petition should be "liberally construed"

---

[6] Rule 45 of the Texas Rules of Civil Procedure provides, in part, that: "Pleadings in the district and county courts shall (a) be by petition and answer; (b) consist of a statement in plain and concise language of the plaintiff's cause of action or the defendant's grounds of defense." TEX. R. CIV. P. 45. Rule 47 provides, in part, that: "An original pleading which sets forth a claim for relief, whether an original petition, counterclaim, cross-claim, or third party claim, shall contain: (a) a short statement of the cause of action sufficient to give fair notice of the claim involved; (b) a statement that the damages sought are within the jurisdictional limits of the court…." TEX. R. CIV. P. 47.

to include both of her negligence claims.[7]   In support of her argument, Munoz points to the Supreme Court's holding in *Roark v. Allen*, 633 S.W.2d 804, 809-10 (Tex. 1982).   In *Roark*, the plaintiff filed a lawsuit against a defendant doctor, claiming that during the breech delivery of her child, the child sustained a fractured skull.   At trial, the court submitted a special issue to the jury on the question of whether the doctor had been negligent in his use of forceps during the delivery. The court of appeals concluded that the plaintiff's petition was deficient as it failed to give fair notice to the defendant doctor of her negligence claim, and therefore did not support the special issue, as the plaintiff had failed to specifically allege in her petition that the defendant doctor was negligent in his use of forceps and/or that his negligence proximately caused the child's injuries. The Supreme Court disagreed, however, finding it significant that the defendant never filed special exceptions to the petition claiming that it was "obscure," or otherwise vague, and that the doctor therefore waived any such defects in the petition.   *Id*. at 810.   In reaching this conclusion, the Court did hold that in the absence of any such special exceptions, "a petition will be construed liberally in favor of the pleader," and the Court therefore liberally construed the plaintiff's petition, finding that it gave the defendant doctor "fair and adequate notice" of the allegations against him, i.e., that he had performed the delivery in a negligent manner, which thereby caused her son's injuries, and that the doctor was therefore not deprived of his ability to prepare his defense.   *Id.* at 809-10.

In the present case, Munoz's original petition was like the plaintiff's petition in *Roark*, as

---

[7] TEX. R. CIV. P. 91 provides that, "A special exception shall not only point out the particular pleading excepted to, but it shall also point out intelligibly and with particularity the defect, omission, obscurity, duplicity, generality, or other insufficiency in the allegations in the pleading excepted to."   A special exception is typically used to complain to a trial court that a plaintiff has failed to plead a valid cause of action in her petition.   *See, e.g., Baca v. Sanchez*, 172 S.W.3d 93, 96 (Tex. App.--El Paso 2005, no pet.) (recognizing that a "special exception" is the appropriate vehicle for urging that a plaintiff has failed to plead a valid cause of action, which a defendant must file prior to filing a motion to dismiss).

18

it alleged that Dr. Pacheco performed her surgery in a negligent manner, thereby causing "injuries" to include "urinary problems[.]" Thus, given no special exceptions were filed, her petition can be liberally construed to support a finding that Dr. Pacheco was given fair notice of her claim that he was negligent in performing the surgery, that is, performing a medically unindicated or unnecessary surgery or performing the surgery negligently that led to her "injuries" including urinary problems. *Cf. Univ. of Tex. Med. Branch at Galveston v. Qi*, 370 S.W.3d 406, 415 (Tex. App.--Houston [14th Dist.] 2012, no pet.) (plaintiff's various "claims" that defendant doctor and nurse were negligent in treating the patient were all one "cause of action," despite the fact that the claims were based on different actions, where all of the claims were all based on the same set of facts that allegedly led to the plaintiff's injuries); *Peloza v. Cuevas,* 357 S.W.3d 200, 205 (Tex. App.--Dallas 2012, no pet.) (plaintiff's cause of action was not "new" where plaintiff previously alleged that defendant doctor negligently performed three "failed" spinal surgeries, which did not relieve her condition, and later added that the negligence was caused in part by the doctor's own medical condition).

We find the trial court did not abuse its discretion in finding Munoz's negligence cause of action in her original petition encompassed the negligent performance of the procedure and performance of the procedure when it was not medically indicated. Further, the amended petition did not allege a "new" cause of action. If the medical expert report adequately supports either of these theories of liability, then the TMLA threshold has been met.

**The Expert Report**

Appellant first argues the initial expert report failed to identify the standard of care and does not adequately address causation. Dr. Pacheco asserts the curative report, likewise, did not

19

properly discuss the standard of care and the breach. We disagree.

As noted in the foregoing, an expert report must provide "a fair summary of the expert's opinions" regarding (1) the standard of care, (2) how the health care provider failed to meet that standard, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See Tiscareno,* 495 S.W.3d at 606. Here, Dr. Barrash outlined the standard of care under the ODG criteria and what conditions must exist for spinal fusion to be medically necessary. He opined that after reviewing Munoz's medical records to include her MRI, he found the conditions for the spinal fusion surgery, pursuant to the ODG, were not present and therefore, Pacheco violated the standard of care by performing the surgery of January 16, 2013 on Munoz.

Munoz must link the defendant's alleged negligence to the injury suffered. If there is a break in the logical chain between the negligent act and the injury, the causation conclusions in a medical expert report are insufficient. *See, e.g., Regent Health Care Ctr. of El Paso, L.P. v. Wallace,* 271 S.W.3d 434, 441 (Tex. App.--El Paso 2008, no pet.) (finding report insufficient due to analytical gap between worsening skin condition, fall, and patient's death). Dr. Pacheco asserts the medical expert report (1) fails to explain "how" the surgery was negligently performed; (2) how the nerves should have been protected; (3) fails to identify what steps should have been taken to protect the nerves; (4) basis for causation was conclusory; and (5) failed to link the loss of bladder control to the surgery. However, Dr. Pacheco's assertions appear to urge us to resolve an ultimate cause-in-fact question on the merits. We decline that invitation.

Here, Dr. Barrash's report meets the fair summary standard on causation by logically linking the alleged breach and the alleged harm by explaining that if the medically unindicated surgery had not been performed, Munoz would not have suffered her injuries to include the urinary

20

problems. He opines that the "evidence-based data shows that for Mrs. Munoz, the procedure would not be effective in treating her condition." The medical expert report provides articulable, plausible and complete support of the allegations against Dr. Pacheco. Dr. Barrash's report provides a fair summary of Munoz's theory on causation and the standard of care.

We find the trial court did not abuse its discretion in overruling Dr. Pacheco's motion to dismiss and objections to the medical expert report.

## CONCLUSION

We overrule Appellant's issues and affirm the judgment of the trial court.


YVONNE T. RODRIGUEZ, Justice

July 25, 2018

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., not participating

21