

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00238-CV

_____

BAYLOR ALL SAINTS MEDICAL CENTER D/B/A BAYLOR SCOTT & WHITE
ALL SAINTS MEDICAL CENTER-FORT WORTH, Appellant

V.

WANDA DEXTER, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE
ESTATE OF MARLA JO VORHIES, Appellee

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-295239-17

Before Sudderth, C.J.; Gabriel and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

In this interlocutory appeal,[1] we consider the qualifications needed for a physician to opine about the standards of care for serving hot soup to a physically and mentally impaired hospital patient. Appellant Baylor All Saints Medical Center d/b/a Baylor Scott & White All Saints Medical Center-Fort Worth (Baylor) contends that the trial court abused its discretion by denying its motion to dismiss the health care liability claims of appellee Wanda Dexter, Individually, and as Representative of the Estate of Marla Jo Vorhies (Vorhies). Baylor contends that the expert reports served by Vorhies, who sustained second- and third-degree burns from the hot soup, were insufficient to satisfy requirements of chapter 74 of the civil practice and remedies code[2] and that the trial court was therefore required to dismiss Vorhies's claims. We disagree and affirm the trial court's order denying Baylor's dismissal motion.

## Background

In 2015, Marla Jo was admitted to Baylor for health issues unrelated to the litigation at issue. While she was there, Baylor lost her dentures, and because she could not chew, she was placed on a liquid diet. One day during her stay, a Baylor employee served her soup. Marla Jo told the employee that the soup was cold and asked the employee to warm it. Ten to fifteen minutes later, hospital staff returned with the soup, which was in a Styrofoam cup, and placed the soup in front of Marla Jo. When

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9).

[2] *See id.* §§ 74.001–.507.

2

she attempted to drink the soup, it burned her mouth and tongue, and she dropped it onto her lap. The soup burned her waist and thighs, and she screamed in pain. She died three days later, although apparently not as a result of the burns.

Vorhies sued Baylor for negligence, seeking actual and exemplary damages. Vorhies pleaded that Baylor was negligent in several respects, including serving the soup at an unsafe temperature and in an improper container, losing her dentures, failing to warn her of the soup's temperature, and failing to train and supervise employees on food preparation and service.

To support her pleading, Vorhies served a report by Catherine Hutt, Ph.D., a dietician and food scientist. In her report, Dr. Hutt recited considerable education and experience in food-safety matters with public entities and private companies. With respect to Vorhies's injuries resulting from the scalding soup, Dr. Hutt's report stated in part,

> It is a fact that the soup heated in a Styrofoam container by Baylor employees and staff was known to be intended for Ms. Vorhies and that her compromised condition was well recognized. . . . [T]he soup was hot enough to cause serious burns to Ms. Vorhies . . . .
>
> It is my professional opinion that Baylor employees and staff allowed Ms. Vorhies to be served soup that was defective and dangerously hot. They were negligent in failing to consider her physical and mental impairments that put her in grave risk for personal injury, and they failed to protect her from serious burns to her body. . . . Baylor failed to properly train and prepare their staff to recognize the risks to physically and mentally compromised patients posed by hot beverages.
>
> . . . .

3

The standard for care in the hospital setting for Ms. Vorhies should have included much greater care and attention relative to the dangers hot liquids posed to this patient. Hot beverages provided for Ms. Vorhies were not temperature regulated, temperature was not monitored, and she was allowed to be placed in grave danger . . . by a team of employees apparently not informed of standard industry practice and who were not prepared to provide proper care.

Baylor objected to Dr. Hutt's report and asked the trial court to dismiss Vorhies's suit. Baylor argued that Dr. Hutt's report did not constitute a proper report under chapter 74 of the civil practice and remedies code because Dr. Hutt was not qualified to opine about the standard of care for serving soup to an impaired hospital patient. More specifically, Baylor contended, in part, that the statute requires an expert who opines about standards of care to be practicing health care at the time of the claim[3] and that Dr. Hutt, as a food scientist, does not practice health care. Baylor also asserted that Dr. Hutt is not qualified to opine on the cause of Vorhies's injuries because Dr. Hutt is not a physician.[4]

Vorhies responded to Baylor's motion, arguing that Dr. Hutt's report was sufficient because she provided a fair summary of how Baylor was negligent and of the causal link between that negligence and Vorhies's injuries. Alternatively, Vorhies asked the court to allow thirty days for her to cure any deficiency by serving another report if the trial court found Dr. Hutt's report to be deficient.

---

[3] *See id.* § 74.402(b)(1).

[4] *See id.* § 74.403(a).

The trial court sustained Baylor's objections to Dr. Hutt's report. The court granted Vorhies's request for an opportunity to cure.

On her second opportunity to satisfy chapter 74's expert-report requirements, Vorhies again served Dr. Hutt's original report along with a report and curriculum vitae from David Lavine, M.D., a board-certified plastic surgeon. Dr. Lavine's report stated,

> I have been licensed to practice medicine in the State of Texas since 1977. I have general and specialized training in burns and I have treated patients who have suffered burns of varying degrees, including, but not limited to, severe burns. Additionally, I provide medical treatment to my patients in a hospital setting and currently have hospital privileges at Plaza Medical Center in Fort Worth, Texas.
>
> I received my . . . Doctor of Medicine Degree from the University of Virginia Medical School. As part of my education and training, I completed a general surgery residency [at] Baylor University Medical Center and plastic surgery residencies at Hermann Hospital and Akron City Hospital. I also completed a Hand Fellowship at Akron City Hospital. In addition to my residencies and fellowship, I have received education and training specific to burn injuries, including the cause, treatment, and prevention of burns, at the Shriner's Burn Institute in Boston, Massachusetts[5] which is a health care facility dedicated to the treatment and care of burn patients. Finally, from my medical school training, education, residencies, fellowship, and over 40 years of treating patients, I am familiar with how to treat and have been involved in treating and caring for patients in an impaired condition in a hospital setting.
>
> . . . My opinions are based upon my education, training, experience, examination of photos of Ms. Vorhies's burns, and review of medical records from Baylor Scott & White Hospital. . . .

---

[5]Dr. Lavine's curriculum vitae reveals that his training at Shriner's Burn Institute was an eight-week externship in 1971, before he began practicing medicine.

5

I have reviewed the burn photos and the medical records of Ms. Vorhies . . . . Ms. Vorhies was admitted to the hospital . . . with a diagnosis of "hepatic encephalopathy" and associated degenerative medical conditions. Shortly after her admission she was served a re-heated hot cup of broth by hospital staff. The patient spilled the broth on her groin resulting in extensive deep and full thickness scald burns in the left groin and buttocks area. My opinion on the severity of the burns is based on the review of photographs taken after the trauma.

It is my medical opinion, based on the patient's overall impaired condition and diagnosis of "hepatic encephalopathy," that she would have been unable to physically and mentally reach up to a serving table and adequately hold the cup to drink the heated broth. At the time of injury, Ms. Vorhies suffered from impaired cognition, impaired neuromuscular function, impaired musculoskeletal function, and poor vision. Subsequent to the spill and concomitant with her condition, she could not be able to quickly dry the scalded area, which pooled in her groin and buttocks area, thereby exacerbating her trauma.

It is apparent from the photos that deep partial and full-thickness burns (second and third degree) were caused by scalding liquid of a temperature ranging from 120–160 degrees Fahrenheit. Temperatures in the lower range of 120 degrees will still result in a full thickness burn if exposed over thirty seconds, which appears to be her case. This opinion is based on my forty plus years of clinical experience with burns . . . .

The standard of care requires that food or liquid served to patients be served at a temperature that is safe for human consumption and is not so hot that it endangers the person to whom it is served. Additionally, the standard of care requires that food or liquid served to a physically or mentally impaired individual be served not only at a safe temperature but in a safe manner that a person with impairment can handle. [Baylor] breached the standard of care by serving Ms. Vorhies broth that was dangerously hot and breached the standard of care by serving her the dangerously hot broth in a cup which would require her to pick it up and drink it when she was in a mentally and physically impaired state that would make such a task difficult or impossible.

[Baylor] breached the standard of care as described above and this breach was the proximate cause of the burn injuries to Ms. Vorhies. Specifically, the broth served to Ms. Vorhies was served at an unsafe and

extremely dangerous temperature of at least 120 degrees which caused her burns when it made contact with her skin. Further, [Baylor] breached the standard of care in regard to serving dangerously hot broth in a drinking cup to a severely impaired patient which caused the patient to spill the soup resulting in the burns.

In conclusion, it is my professional opinion that [Baylor] was negligent and grossly negligent. Based on reasonable medical probability, the standard of care was breached by [Baylor] which proximately caused the burns suffered by Ms. Vorhies. In addition, such scalding burns are extremely painful and would result in a pain level of 9.5 on a 10 scale.

Baylor again filed objections and asked the trial court to dismiss Vorhies's suit. Baylor objected to Dr. Hutt's report on the same grounds as its prior objections to that report. Baylor also contended that Dr. Lavine's report was insufficient because he did not demonstrate his qualifications to opine about the hospital's standards of care or breach of those standards. With respect to that argument, Baylor urged that while "Dr. Lavine may be qualified to opine on a case involving plastic surgery or the repair of a burn via plastic surgery, there is nothing in [his] report . . . that qualifies him to opine on the role of a hospital in formulating and [administering] policies or protocols or in training or supervising employees." Baylor also asserted that Dr. Lavine's report was deficient because he did not "state that he ha[d] ever worked with nurses or patient care technicians in a hospital setting, and he [was] completely silent as to whether he ha[d] interacted with nurses o[r] patient care technicians in the context of preparing and serving food to patients in a hospital." Finally, Baylor asserted that Dr. Lavine was not qualified to opine about how Baylor's alleged negligence caused Vorhies's injuries and that Dr. Lavine's opinions on causation were conclusory.

7

In responding to Baylor's second motion to dismiss, with respect to Dr. Lavine's report, Vorhies contended that he had demonstrated his qualifications to render opinions because he provides treatment to patients in hospital settings, because he has special training in the cause and treatment of burn injuries, and because he is familiar with how to treat patients with impaired conditions.

The trial court denied Baylor's second motion to dismiss. Baylor brought this appeal.

### Dr. Lavine's Qualifications to Opine about Standards of Care [6]

In the second part of its only issue, Baylor argues that Dr. Lavine's report did not satisfy the expert-report requirements of chapter 74 of the civil practice and remedies code. Baylor's challenge to Dr. Lavine's report is more limited in this court than in the trial court. Here, Baylor contends only that Dr. Lavine's report did not establish his qualifications to opine about Baylor's standards of care.[7] Baylor asserts

---

[6]The trial court denied Baylor's motion to dismiss only after Vorhies served Dr. Lavine's report, so we will presume that the trial court found that Dr. Lavine's report satisfied the requirements of chapter 74 on its own and denied the motion to dismiss on that basis. Because we hold below that the trial court did not abuse its discretion by denying the motion to dismiss based on the adequacy of Dr. Lavine's report, we will not analyze the alleged deficiencies in Dr. Hutt's original report, as resubmitted, which Baylor raises in the first part of its sole issue. *See* Tex. R. App. P. 47.1.

[7]Although some statements within Baylor's brief appear to present a broader challenge, at oral argument, Baylor's counsel clarified, "We're not here on the contents on the report [or on] qualifications as to causation. *We're here only as to qualifications to opine on standards of care.*" [Emphasis added.]

8

that Dr. Lavine did not demonstrate "qualifications which would allow him to opine on the nursing, hospital, or health care at issue."

Under chapter 74, when a plaintiff files a health care liability claim,[8] the plaintiff must serve an expert report that provides a fair summary of the expert's opinions regarding standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6). If a plaintiff does not serve such a report, upon the defendant's motion, the trial court must dismiss the plaintiff's suit and award attorney's fees to the defendant. *Id.* § 74.351(b). When a plaintiff serves a report but a defendant asserts that the report is inadequate, the court must determine whether the report represents an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l*). To constitute a good-faith effort, the report must inform the defendant of

---

[8]Vorhies does not contest that her suit constitutes a health care liability claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (defining "health care liability claim"); *see also Omaha Healthcare Ctr. v. Johnson*, 344 S.W.3d 392, 395 (Tex. 2011) (holding that a plaintiff's suit against a nursing home for a death caused by a brown recluse spider bite was a health care liability claim that required the service of an expert report); *Fields v. Metroplex Hosp. Found.*, No. 03-04-00516-CV, 2006 WL 2089171, at *1–3 (Tex. App.—Austin July 28, 2006, no pet.) (mem. op.) (holding that a complaint that nurses burned a patient with a hot compress was a health care liability claim that required the service of an expert report, and stating that a "plaintiff's statutory obligation to file a timely expert report remains even if the causation is commonly understood"). *But see Quintanilla v. Coral Gables Hosp., Inc.*, 941 So. 2d 468, 471 (Fla. Dist. Ct. App. 2006) (holding that when a nurse spilled hot tea on a patient, the resulting suit was not a medical malpractice suit and did not trigger statutory presuit requirements).

the conduct the plaintiff has called into question and provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). An expert report need not marshal all of the plaintiff's evidence, but it must explain, to a reasonable degree, how and why the breach caused the plaintiff's injury. *Jackson v. Kindred Hosps. Ltd. P'ship*, No. 02-18-00027-CV, 2018 WL 5668533, at *1 (Tex. App.—Fort Worth Nov. 1, 2018, no pet. h.).

An "expert" who is qualified to draft a report under section 74.351 with respect to a health care provider's standards of care and breach of those standards means someone who

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider . . . at the time the testimony is given or was practicing that type of health care at the time the claim arose;

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)–(3); *see id.* § 74.351(r)(5)(B).

With respect to the third criterion under section 74.402(b), the court shall consider whether, at the time the expert renders an opinion, he "(1) is certified by a licensing agency. . . or has other substantial training or experience . . . in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim." *Id.* § 74.402(c)(1)–(2). Under this criterion,

we must recognize that there is no validity to the notion that every licensed medical doctor is qualified to testify as an expert on each medical question. *Benge v. Williams*, 548 S.W.3d 466, 472 (Tex. 2018). We must also consider, however, that if the subject matter is common to all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Simpson v. Barton*, 527 S.W.3d 281, 286 (Tex. App.—El Paso 2016, no pet.)

We review a trial court's ruling on the adequacy of an expert report for an abuse of discretion. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017). A trial court abuses its discretion when it makes a decision without using guiding rules or principles. *Id.* at 512–13. In applying the abuse-of-discretion standard, we may not substitute our judgment for the trial court's judgment. *Id.* at 513. In reviewing the trial court's ruling, we consider only the information within the report. *Bowie Mem'l Hosp.*, 79 S.W.2d at 52; *see Pacheco-Serrant v. Munoz*, 555 S.W.3d 782, 791 (Tex. App.—El Paso 2018, no pet.) ("The court should not have to fill in missing gaps in a report by drawing inferences or resorting to guess work."). We bear in mind that the Legislature's goal was to deter baseless claims, not block earnest ones. *Jackson*, 2018 WL 5668533, at *2.

Baylor contends that Dr. Lavine's report is insufficient to show his qualifications to opine about the hospital's standards of care because he did not specifically state that he was familiar with the standards or explain how he was familiar with them. Baylor emphasizes that nothing in Dr. Lavine's report shows that he has

11

taught or worked with nurses or hospital staff as to gain knowledge of a standard of

care for serving meals to patients. Baylor contends,

> There is simply nothing in Dr. Lavine's report or curriculum vitae that
> suggests he has ever been involved in the acts and omissions complained
> of in [Vorhies's] [p]etition . . . . Upholding the [t]rial [c]ourt's ruling in
> this case would allow any physician to provide adverse standard of care
> testimony against any hospital or non-physician healthcare provider on
> any subject without requiring the physician to show . . . familiarity,
> experience, or training . . . to make them familiar with the specific . . .
> standard of care that the physician is critical of.

Vorhies contends that the trial court did not abuse its discretion by denying

Baylor's second motion to dismiss because Dr. Lavine's report and curriculum vitae

demonstrate that

> based on his 42 years of experience treating patients in an impaired
> condition in a hospital setting and his education and training specific to
> burn injuries, including the cause, treatment, and prevention of burns,
> [he] possesses the requisite degree of knowledge, skill, experience,
> training, and education to opine on the standard of care when serving an
> impaired patient hot soup. . . . [T]he trial court did not abuse its
> discretion because 1. Dr. Lavine is practicing health care in a field of
> practice that involves the same type of care or treatment as that
> delivered by Appellee, i.e. treatment of impaired patients in hospital
> settings; 2. Dr. Lavine has knowledge of accepted standards of care for
> health care providers for the diagnosis, care, or treatment of the illness,
> injury, or condition involved in the claim – i.e. particularly with this
> common subject matter of serving impaired patients hot liquids; and
> 3. Dr. Lavine is qualified on the basis of his 42 years of training and
> experience to offer an expert opinion regarding those accepted standards
> of health care.

We agree with Vorhies that Dr. Lavine's report is sufficient to satisfy

chapter 74's requirements. The gist of Vorhies's suit is that Baylor's employees failed

to take measures to prevent burns from scalding liquid to an impaired patient in a

12

hospital setting.[9] Dr. Lavine's report demonstrates his experience and training in preventing burns, in diagnosing and treating burn injuries, in caring for impaired patients, and in practicing in a hospital setting.

First, with respect to burns, Dr. Lavine states that he has general and special training concerning burns and that he has experience treating burn patients over the course of his "forty plus years of clinical experience with burns." He also states that he has received training in burn prevention during an externship at the Shriner's Burn Institute, "a health care facility dedicated to the treatment and care of burn patients."[10] Dr. Lavine states that the opinions he offers—including that Baylor heated the soup

---

[9]In her petition, Vorhies pleaded that Baylor was negligent by, among other acts and omissions, (1) "[f]ailing to recognize or appreciate the danger of serving extremely hot liquid," (2) "[s]erving soup at an unsafe temperature," (3) "[s]erving soup that was unfit for human consumption," (4) "[s]erving soup at a temperature that did not conform to industry standards," and (5) "[f]ailing to warn Vorhies of the dangerous temperature of the soup."

[10]Section 74.402 requires an expert to have "knowledge of accepted standards of care" and to be qualified on the basis of "training or experience." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(2)–(3). Baylor suggests that Dr. Lavine's eight-week externship at Shriner's Burn Institute in 1971 is the sole extent of his training and that the number of years that have passed since the externship render his expertise incredible. But Dr. Lavine did not limit his training and experience to the externship alone; he merely highlighted a particularly noteworthy education opportunity in forty years of practice, all of which have included the treatment of burn patients. Moreover, in reviewing a report under section 74.351, we do not decide whether the expert is credible or assess the weight of the expert's opinions. *See Curnel v. Houston Methodist Hosp.-Willowbrook*, No. 01-17-00088-CV, 2018 WL 3883402, at *5 (Tex. App.—Houston [1st Dist.] Aug. 16, 2018, no pet.) (op. on reh'g); *see also Gannon v. Wyche*, 321 S.W.3d 881, 892 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("[T]he credibility and weight to be given to the facts supporting the expert's opinion is an issue for trial.").

to a "dangerously hot" 120 to 160 degrees—arise from this training and from his review of Vorhies's medical records, including photographs documenting the severity of her burns.

Second, Dr. Lavine's report explains his experience in caring for impaired patients in hospitals. He explains that he has hospital privileges at a Fort Worth hospital. Dr. Lavine avers that his experience in treating such patients in such settings informs his opinions that Vorhies, who had hepatic encephalopathy (characterized in part by impaired mental and physical functioning as well as poor vision), was not capable of safely holding a heated cup or avoiding further injury once the scalding soup spilled on her, and Baylor therefore breached the standard of care by giving her the soup "in a cup which would require her to pick it up and drink it."

Despite these facts that qualify Dr. Lavine to opine about Baylor's standard of care and Vorhies's injuries based on his practice history, knowledge, and training, Baylor argues that he is not qualified under the principles articulated above because he does not describe what training or experience supports his opinions on the proper service of food by nurses or hospital staff to patients. Baylor asserts that Dr. Lavine's report is insufficient because he "does not indicate that he has ever worked with hospital nurses or other staff [or that he has] trained hospital nurses or other staff." Although Dr. Lavine's report does not contain these specific statements, it does establish his surgical practice treating patients in hospitals spanning forty years, beginning with residencies and a fellowship and extending to his current practice.

14

As explained above, Dr. Lavine demonstrates his qualifications to opine about the risk of burns associated with hot liquids in general and, more specifically, the inadvisability of serving hot liquids to impaired patients such as Vorhies.[11] More particularly, Dr. Lavine establishes that as a plastic surgeon with specific experience treating burns, he possessed the expertise to assess the severity of Vorhies's burns and, having reviewed the hospital records and confirmed that the source of her burns was the soup reheated and served by hospital staff, concluded that the soup was dangerously hot for a patient of her mental and physical faculties. Baylor neither challenges his qualifications to deduce the likely temperature of the soup from the severity of the burns nor to conclude that a mentally and physically impaired patient should not be served as though she was neither. Instead, Baylor implicitly argues that the reheating and service of soup by hospital staff is somehow unique and distinct from the rest of the medical community responsible for the care and treatment of mentally and physically impaired patients. This elevates form over substance to the

---

[11]As our sister appellate court has explained,

It was the duty of the hospital to provide for the care and protection of its patients, and in the exercise of this duty the hospital was required to provide such reasonable care *as the patient's known condition required.* The hospital's responsibility to its patient extended to the taking of such measures as were necessary to prevent the patient from hurting himself if the hospital knew or, in the exercise of reasonable care, should have known that the patient's mental incapacity might lead to his own injury.

*Harris v. Harris Cty. Hosp. Dist.*, 557 S.W.2d 353, 355 (Tex. App.—Houston [1st Dist.] 1977, no writ) (emphasis added).

point of treating Dr. Lavine like the wayward plumber proposed by former Justice Willett. *See Ogletree v. Matthews*, 262 S.W.3d 316, 324 (Tex. 2007) (Willett, J., concurring).

We conclude that the trial court could have reasonably determined that Dr. Lavine was not required to demonstrate additional qualifications to opine about the standards of care particular to the service of hot liquids by nurses or other staff on the basis that the safe service of such liquids to impaired patients is common to all medical professionals.[12] *See Simpson*, 527 S.W.3d at 286; *Gonzalez v. Padilla*, 485 S.W.3d 236, 243 (Tex. App.—El Paso 2016, no pet.) (stating that an expert is qualified "so long as his general work experience and knowledge establishes an ability to offer a sufficient opinion on proper practices"); *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (explaining that a physician may be qualified to provide an expert report even when his specialty differs from that of the defendant "if

---

[12]Vorhies contends that there is "no different standard of care that turns a scalding hot liquid into a liquid that is safe for human consumption based on who serves it." To the extent that Baylor argues that standards for the proper heating and serving of soup differ between physicians, nurses, and other hospital staff and that Dr. Lavine's report needed to be tailored in that respect, the trial court could have reasonably rejected that contention. *Cf. Severn v. A. O. Smith Corp.*, No. 07-97-00151-CV, 1998 WL 254444, at *6 (Tex. App.—Amarillo May 20, 1998, no pet.) (not designated for publication) (expressing that the risks associated with hot liquids are "matters of common knowledge"); *Malone v. Hendrick Med. Ctr.*, 846 S.W.2d 951, 954 (Tex. App.—Eastland 1993, writ denied) ("We hold that the act of burning someone with water that is too hot and the resulting pain are . . . matters plainly within the common knowledge of laymen. The average person knows that physical pain will be experienced if water that is too hot is applied to the body. Furthermore, a layman is competent to describe the facts surrounding burning and the extent of the resulting pain.").

the subject matter is common to and equally recognized and developed in *all* fields of practice"); *see also Jorgensen v. Tex. MedClinic*, 327 S.W.3d 285, 288 (Tex. App.—San Antonio 2010, no pet.) (concluding that it was "self-evident that the proper protocol for the administration of a flu vaccine d[id] not vary among health care providers, and therefore, the standard of care [was] the same no matter who performed the procedure").

Similarly, Baylor argues that Dr. Lavine's report is insufficient because while he describes standards of care for serving hot liquid to impaired patients, he does not specifically state that he is familiar with nursing or hospital staff standards.[13] We conclude, however, that Dr. Lavine's demonstration of his knowledge of the standards, coupled with his statements concerning his training and experience from which he obtained that knowledge, properly establish his qualifications. *See Christus Spohn Health Sys. Corp. v. Hinojosa*, No. 04-16-00288-CV, 2016 WL 7383819, at *3 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (mem. op.) ("[W]e disagree with the Hospital's contention that Dr. Baker did not establish he was qualified because he did not specifically state he was familiar with the standard of care concerning emergency room nurses. To determine if Dr. Baker was qualified on the applicable standard of care, we must look to the condition involved in the claim and the expert's familiarity with it."); *Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 542 (Tex. App.—El Paso 2014,

---

[13]At oral argument, Baylor emphasized that Dr. Lavine "never says that he's familiar with the standard of care for nurses or for other hospital staff who were involved in the care [in] this case."

no pet.) (holding that a nurse was qualified to opine about standards of care because while the nurse did "not expressly state she [was] familiar with the standard of care for nurses for the prevention of falls of obese patients in a hospital setting," she detailed the knowledge of what "floor nurses should have done when assisting an obese patient, who had recently had a total knee replacement, move from a recliner to the bedside commode"); *Moore v. Gatica*, 269 S.W.3d 134, 142 (Tex. App.—Fort Worth 2008, pet. denied) (op. on remand) (holding that an expert's familiarity with the issues involved in a suit about a botched appendectomy could be established through the expert's detailed discussion of the standard of care).

Finally, Baylor challenges Dr. Lavine's qualifications to opine about hospital administration, including the "role of a hospital in formulating . . . policies or protocols or in training or supervising employees." In other words, Baylor challenges Dr. Lavine's qualifications to opine about Vorhies's direct liability claims that are based on alleged omissions by Baylor itself rather than acts or omissions of Baylor's nurses or staff.[14] As long as an expert report satisfies chapter 74's requirements as to at least one theory, the plaintiff's entire suit against the defendant may proceed. *SCC Partners, Inc. v. Ince*, 496 S.W.3d 111, 114–15 (Tex. App.—Fort Worth 2016, pet. dism'd). We have held above that Dr. Lavine's report satisfies chapter 74's

---

[14]In Vorhies's pleading, she asserts that Baylor was negligent by "[f]ailing to properly train employees on food preparation and service," by "[f]ailing to properly train employees on food safety," and by "[f]ailing to properly supervise employees on food preparation, service, and safety."

18

requirements with respect to Vorhies's claims against Baylor that are vicariously based on the acts or omissions of Baylor's food service employees or nursing staff. Therefore, we conclude that Vorhies's suit against Baylor, including her direct liability claims, may proceed. *See id.*; *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) (holding that because a plaintiff served an adequate expert report supporting vicarious liability claims, the plaintiff's direct liability claims could proceed).

For all of these reasons, we hold that the trial court did not abuse its discretion by denying Baylor's motion to dismiss. We overrule Baylor's sole issue.

## Conclusion

Having overruled Baylor's only issue, we affirm the trial court's order denying Baylor's motion to dismiss.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: January 24, 2019

19